UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ROBERT KNAUSS #423490,

        Petitioner,                    Hon. Janet T. Neff

v.                                  Case No. 1:20-cv-1123

RANDEE REWERTS,

        Respondent.
_____/


**REPORT AND RECOMMENDATION**

      This matter is before the Court on Knauss' petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner habeas petitions, the undersigned recommends that Knauss' petition be denied.


**BACKGROUND**

      As a result of events that occurred in 1995, Petitioner was charged with first-degree murder. Several individuals testified at Petitioner's jury trial.[1] The relevant portions of their testimony are summarized below.

**Carol Reffitt**

      Reffitt was Vince Adamczak's younger sister. (ECF No. 13-20; Trial Transcript, June 2, 2015, at 93). She last saw her brother alive in August 1994. (*Id.*

---

[1] Petitioner and Pete Peterson were jointly tried by separate juries.

at 97).  Reffitt subsequently learned that her brother was missing.  (*Id.* at 97-100).

Adamczak was eventually declared dead.  (*Id.* at 100-01).

## Sue Rehacek

Rehacek was briefly married to Petitioner from 1990-1992.  (ECF No. 13-20; Trial Transcript, June 2, 2015, at 110-11).  The pair had three children together, Joshua, Jeremy, and Sara.  (*Id.* at 111).  In 2002, Joshua reported some information to Rehacek that "trouble[d] and concern[ed]" her.  (*Id.* at 112-15).  Rehacek did not report this information to the police because she was "scared to death" of Petitioner. (*Id.* at 110, 115).  Instead, Rehacek reported to her father, James Braun, what Joshua told her.  (*Id.* at 115).

## James Braun

Braun is Sue Rehacek's father.  (ECF No. 13-20; Trial Transcript, June 2, 2015, at 121).  Braun was friends with Vince Adamczak for many years.  (*Id.* at 122-24). After his daughter shared certain information with him, Braun reported it to the Michigan State Police.  (*Id.* at 125-27).  Braun also reported that Petitioner once beat his daughter "half to death."  (*Id.* at 130-31).

## Walter Armstrong

As of January 23, 2002, Armstrong was employed as a Detective Sergeant with the Michigan State Police.  (ECF No. 13-20; Trial Transcript, June 2, 2015, at 132-33).  On this date, the Michigan State Police began an investigation, based on information provided by James Braun, concerning "a missing person case that had some suspicious circumstances."  (*Id.* at 133-34).  This investigation revealed no

evidence that Vince Adamczak was still alive.  (*Id.* at 135-36).  Armstrong joined the investigation "around" May 2002, shortly after which it transformed into a homicide investigation.  (*Id.* at 134-35).

Armstrong interviewed Petitioner on August 26, 2008.  (*Id.* at 137-38). Petitioner stated that he had not seen Adamczak in "10 to 15 years. . .since they got arrested in Newaygo County."  (*Id.* at 138).  According to Petitioner, he encountered Adamczak at Pete Peterson's residence "after he got out of jail."  (*Id.*).  Petitioner asked Adamczak whether he had "taken guns that were in the van that they were arrested in in Newaygo County and sold them."  (*Id.* at 138-39).  According to Petitioner, Adamczak "admitted that he had sold those guns and told [Petitioner] he would get those back."  (*Id.* at 139).  Petitioner stated that he never again saw Adamczak.  (*Id.*).

Armstrong also interviewed Rose Skrzycki.  (*Id.* at 140).  Skrzycki was present when Adamczak admitted selling Petitioner's guns.  (*Id.* at 141-42).  Specifically, Adamczak admitted giving the guns to his girlfriend, Carol Adams, so that she could sell them.  (*Id.*).  According to Skrzycki, Petitioner was "upset" that Adamczak sold his guns.  (*Id.*).

**Mark Miller**

As of January 23, 2002, Miller was employed as a Detective Sergeant with the Michigan State Police.  (ECF No. 13-20; Trial Transcript, June 2, 2015, at 154).  On this date, Miller spoke with James Braun after which Miller enlisted the assistance of several agencies to determine whether there existed any evidence of Vince

Adamczak's "existence." (*Id.* at 154-60).  These efforts revealed "no activity on any of Mr. Adamczak's records after 1995." (*Id.* at 160).

Eventually, "skeletal remains" were discovered on Pete Peterson's property. (*Id.* at 169-70).  The residence Petitioner shared with Rosemary Skrzycki was located "just down the roadway just a short distance." (*Id.* at 172).  As part of his investigation, Miller spoke with several individuals and the information Miller obtained "continue[d] to converge on" Petitioner, Pete Peterson, and Rosemary Skrzycki as being "involved in the death of Mr. Adamczak." (*Id.* at 177-78).  Moreover, "there was no one else that was. . .ever mentioned as being involved." (*Id.* at 178).

On June 21, 2011, Petitioner was arrested on a misdemeanor warrant for driving on a suspended license. (*Id.* at 177-80).  Miller and Detective Sergeant Mark Harris then spoke with Rose Skrzycki regarding the killing of Vince Adamczak. (*Id.* at 180).  Miller informed Skrzycki that "there had been people that had been interviewed and had provided a lot of information to us on the case, stating that she and [Petitioner] and Pete Peterson were involved in the killing." (*Id.* at 181).

Skrzycki agreed to speak with the detectives and admitted to being present when Adamczak was killed. (*Id.* at 181-82).  This represented "the first time [the police] had an eyewitness account." (*Id.* at 182).  Skrzycki provided the detectives with "many details [they] felt were significant", including identifying Petitioner and Peterson as Adamczak's killers. (*Id.* at 182, 210-12).  Skrzycki was charged with murder, but eventually pleaded no contest to a lesser offense in return for her "truthful testimony in the case." (*Id.* at 211-15).

Two days later, on June 23, 2011, Petitioner was transported "to the property belonging to Mr. Pete Peterson." (ECF No. 13-20; Trial Transcript, June 2, 2015, at 183; (ECF No. 13-26; Trial Transcript, June 5, 2015, at 76-83). Petitioner "walked the property with [the detectives] and pointed out areas where evidence was recovered." (*Id.*). One of the locations identified by Petitioner was the site where Vince Adamczak's body was "burned." (*Id.*). A search of Petitioner's residence revealed "three or four. . .long guns." (ECF No. 13-20; Trial Transcript, June 2, 2015, at 188). Petitioner informed detectives that Adamczak was killed with a "12-gauge pump shotgun, nickel plated." (*Id.* at 198). The following day, June 24, 2011, excavation of a location identified the previous day by Petitioner revealed "suspected bone," which was secured for further examination and analysis. (*Id.* at 189).

**John Lucey**

As of June 24, 2011, Lucey was employed as a forensic scientist with the Michigan State Police. (ECF No. 13-22; Trial Transcript, June 3, 2015, at 84-85). On this date, Lucey participated in the excavation of a fire pit on Pete Peterson's property in which detectives believed a person "could have been burned in." (*Id.* at 84-85). The fire pit was "a little bit longer" than six feet by nine feet in size. (*Id.* at 84-91). These efforts uncovered "some items that appeared to be bone," which were collected and subsequently analyzed. (*Id.* at 87-94).

**Todd Fenton, Ph.D.**

Dr. Fenton, a forensic anthropologist, testified that he was the director of the Michigan State University forensic anthropology laboratory. (ECF No. 13-22; Trial Transcript, June 3, 2015, at 104-05). On June 30, 2011, Fenton received from the

Michigan State Police materials recovered from Pete Peterson's property. (*Id.* at 109-10). Fenton was asked "to look at the materials and to determine if there were any human bones in the materials." (*Id.* at 110). Fenton identified 12 items that were human bone. (*Id.* at 114-17). Fenton also determined that the bone fragments "displayed evidence of burning." (*Id.* at 117-18).

**Steven Symes, Ph.D.**

Dr. Symes, a forensic anthropologist specializing in the analysis of burned remains, examined the bone fragments recovered from Pete Peterson's property. (ECF No. 13-22; Trial Transcript, June 3, 2015, at 135-49). Symes determined that the bone fragments in question were "subjected to direct heat," were "burned when they were fresh," and "had soft tissues on them when they burned." (*Id.* at 158-60). Examination of the bone fragments revealed that the individual in question was between the ages of 35-60 at the date of death. (*Id.* at 159-61). While Symes was unable to determine with any accuracy how long ago the bones had been burned, he determined that they were burned less than 50 years ago but also "don't look like recent burning." (*Id.* at 161-64).

**Mike Garland**

As of January 30, 1995, Garland was employed as a Michigan State Police Trooper. (ECF No. 13-22; Trial Transcript, June 3, 2015, at 182). On this evening, Garland and his partner were on patrol in Newaygo County. (*Id.* at 183). The pair accomplished a traffic stop on a van that had an "improper" license plate. (*Id.* at 183). The license plate on the van belonged to a different vehicle that was registered to

Carol Adams.  (*Id.* at 183, 188).  Vince Adamczak, who was driving the van, was arrested for operating a motor vehicle while under the influence of alcohol.  (*Id.* at 183-84).  Petitioner, a passenger in the van, was arrested on several outstanding warrants.  (*Id.* at 185).  Rose Skrzycki, also a passenger in the van, was also arrested on outstanding warrants.  (*Id.* at 186).  A search of the van revealed an unidentified number of "long guns," which were not illegal to possess and, therefore, were not confiscated.  (*Id.* at 187).

**Lynwood Butler**

In 1995, Butler owned the Deer Horn Inn located in Wellston, Michigan.  (ECF No. 13-22; Trial Transcript, June 3, 2015, at 193).  On August 16, 1995, Butler had a vehicle, which he assumed had been abandoned, removed from his property and taken to a local salvage yard.  (*Id.* at 193-94, 198).

**Kevin Repo**

As of September 22, 1995, Repo was employed as a Lieutenant with the Manistee Sheriff's Department.  (ECF No. 13-22; Trial Transcript, June 3, 2015, at 195).  On this date, Repo traveled to a salvage yard in Wellston to investigate a 1985 Plymouth vehicle that had been towed from the Deer Horn Inn on the ground that it had been abandoned.  (*Id.* at 195-98).  Repo determined that the vehicle was not stolen and was registered to Sandra Havinga.  (*Id.* at 196-98).  Repo mailed a notice to Havinga informing her that she had a limited amount of time to retrieve her vehicle. (*Id.* at 198-99).  Repo was never contacted by Havinga.  (*Id.* at 199).

**Jeff Adamczak**

Jeff Adamczak is Vince Adamczak's youngest son.  (ECF No. 13-22; Trial Transcript, June 3, 2015, at 201).  Petitioner and Rose Skrzycki were with Vince Adamczak the day Jeff Adamczak, then six or seven years of age, last saw his father. (*Id.* at 201-02).  Adamczak also recalled that his father used to own a van he later traded in on a car.  (*Id.* at 202-03).

**Carol Adams**

By 1995, Adams had been in a relationship with Vince Adamczak for two or three years.  (ECF No. 13-22; Trial Transcript, June 3, 2015, at 210).  Following his January 1995 arrest in Newaygo County, Adamczak contacted Adams to "get the van out of impound and get him out" of jail.  (*Id.* at 215).  Adamczak instructed Adams to sell the weapons that were located inside the van to raise the money necessary to secure his release from jail.  (*Id.* at 215-16).  Adams was unable to locate a purchaser, so she sold the guns to her father who "knew someone to buy the guns."  (*Id.* at 216-17).  This sale generated enough money to pay Adamczak's bail.  (*Id.* at 217).

Petitioner subsequently began calling Adams' residence looking for Adamczak. (*Id.* at 217-18).  Adamczak later told Adams that he needed the guns back that he previously instructed her to sell.  (*Id.* at 218).  Adams responded that she "couldn't get them back because [her] understanding was. . .they were sold." (*Id.*).  Adams did not tell Adamczak that the guns were at her father's house because she did not want to get her father involved.  (*Id.*).  Adams was able to retrieve from her father one of the guns in question.  (*Id.* at 219).  Adamczak took the gun and delivered it to

Petitioner.  (*Id*.).  This was the last time Adams saw Adamczak.  (*Id*.).  In 2011, after her father passed away, Adams recovered the remaining guns from her father's residence and turned them over to the Michigan State Police.  (*Id*. at 224-26).

**John Schneider**

As of January 23, 2002, Schneider was employed as a Michigan State Police Trooper.  (ECF No. 13-24; Trial Transcript, June 4, 2015, at 9).  On this date, Schneider and another trooper interviewed James Braun regarding his report regarding a missing person.  (*Id*. at 9-10).  Schneider continued to participate in the investigation ultimately interviewing numerous additional people.  (*Id*. at 11-15).  Schneider ultimately determined that August 13, 1995, was the last day Vince Adamczak was seen alive.  (*Id*. at 12-13).  Schneider also learned that the abandoned vehicle which had been deemed abandoned at the Deer Horn Inn, in August 1995, belonged to Vince Adamczak.  (*Id*. at 12-19).

**Michael Barna, M.D.**

Dr. Barna testified that he had served as the Manistee County Medical Examiner for the previous thirteen years.  (ECF No. 13-24; Trial Transcript, June 4, 2015, at 25-26).  He did not examine Vince Adamczak's body but based upon the investigative work performed by law enforcement and the Little River Band of Ottawa Indians Tribal Court, Dr. Barna characterized Vince Adamczak's death as a homicide caused by gunshot wounds to the chest and neck.  (*Id*. at 29-33).

**Joseph Adamczak**

Joseph Adamczak is Vince Adamczak's son and Jeffrey Adamczak's brother. (ECF No. 13-24; Trial Transcript, June 4, 2015, at 35). Adamczak described the last time he saw his father. Petitioner and Rose Skrzycki visited Adamczak's residence. (*Id.* at 35-36). When Vince Adamczak and Petitioner later went outside to talk, Skrzycki told Joseph Adamczak to wait inside. (*Id.* at 36). A short while later, Petitioner, Skrzycki, and Vince Adamczak departed in Adamczak's vehicle. (*Id.* at 37-39). Joseph Adamczak never saw his father again. (*Id.* at 39).

**Matthew Kemp**

In December 2007, Kemp attended a Christmas party at Petitioner's residence. (ECF No. 13-24; Trial Transcript, June 4, 2015, at 41-44). While at this party, Kemp overheard Petitioner "telling a story" that he and Pete Peterson "had killed a man and he had helped him get rid of the body." (*Id.* at 44-45). Petitioner stated that Peterson shot the person after which Petitioner helped dispose of the body. (*Id.* at 45-48). Petitioner said he and Peterson "tried burning the body" and eventually just buried the body "out in a field." (*Id.* at 46). Petitioner referred to the victim as "Vince and called him an Indian." (*Id.* at 46). Kemp also heard Petitioner relate the same story on "more than one occasion over the years." (*Id.* at 47). Kemp just assumed Petitioner was "just trying to act tough." (*Id.* at 46).

**Asaph Martin**

Martin related an incident that occurred in 2002 or 2003 in which he was sitting around a campfire with Petitioner and several other individuals including

Petitioner's children.  (ECF No. 13-24; Trial Transcript, June 4, 2015, at 59-63).  At one point, Petitioner's kids "started talking about how bad of a guy their father was. . .because he killed a man."  (*Id.* at 62-64).  Petitioner responded that "he wasn't the one that pulled the trigger. . .he just helped burn the body."  (*Id.* at 63-64).  Petitioner referred to the person whose body he helped burn as a "stupid mother fucker." (*Id.* at 65).  Based on other things Martin overheard Petitioner's kids saying, he "knew" that Petitioner was referring to Vince Adamczak.  (*Id.* at 64).

**Frances D'Angela**

D'Angela is a forensic scientist for the Michigan State Police.  (ECF No. 13-24; Trial Transcript, June 4, 2015, at 71).  In June 2011, D'Angela examined a vehicle for the presence of blood evidence.  (*Id.* at 71-75).  D'Angela discovered several stains that initial testing revealed were blood.  (*Id.* at 73).  D'Angela collected swabs of these stains which he then sent for analysis.  (*Id.* at 73-75).  In November 2014, D'Angela examined five firearms for the presence of blood.  (*Id.* at 75-76).  D'Angela discovered a blood stain on one of the weapons, a double-barrell 12-gauge shotgun.  (*Id.* at 76-77).  D'Angela collected a swab of this stain and sent it for analysis.  (*Id.* at 76-78).

**Nicole Graham**

Graham is a forensic scientist for the Michigan State Police.  (ECF No. 13-24; Trial Transcript, June 4, 2015, at 81-82).  Graham analyzed the swabs that Frances D'Angela collected.  (*Id.* at 83-87).  None of the samples Graham analyzed contained detectable amounts of DNA.  (*Id.*).

**Robert Anthony**

Anthony met Petitioner in the "early 90s" and even dated his sister for a time. (ECF No. 13-24; Trial Transcript, June 4, 2015, at 90-92).  Anthony also became acquainted with Vince Adamczak.  (*Id.* at 92-93).  The trio would socialize "once in a while."  (*Id.* at 93).  Anthony eventually learned that Adamczak was missing.  (*Id.* at 93-94).  Sometime "around 2000, 2001," Anthony encountered Petitioner at a local carnival.  (*Id.* at 94-95).  The pair began talking and when Anthony asked Petitioner about Adamczak, Petitioner responded that "he had whacked him. . .because. . .he took his grandpa's guns and sold them."  (*Id.* at 95-96).

**Rosemary Skrzycki**

Skrzycki began a relationship with Petitioner in 1994.  (ECF No. 13-24; Trial Transcript, June 4, 2015, at 108-09).  By 1995, the two were living together.  (*Id.* at 110).  Skrzycki also knew Pete Peterson and Vince Adamczak.  (*Id.* at 111-12).

On Superbowl Sunday 1995, Petitioner, Adamczak, and Skrzycki made a "spur of the moment" decision to "go out to Oregon to see [Adamczak's] father."  (*Id.* at 113-14).  The trio decided to make the trip in Adamczak's van.  (*Id.* at 115).  In addition to packing clothes, Petitioner brought "all his grandfather's weapons."  (*Id.* at 114-15).  The trio only got as far as Newaygo, however, before Adamczak was stopped by the police.  (*Id.* at 115).  Adamczak was arrested for driving without a license whereas Skrzycki and Petitioner were arrested due to outstanding warrants.  (*Id.* at 114-15).

Skrzycki was released from custody 28 days later.  (*Id.* at 115).  After getting out of jail, Skrzycki learned that "Vince [Adamczak] had gotten ahold of his girlfriend

and told her to either sell the guns, pawn the guns, whatever, to get the bail money to get him out of jail." (*Id.* at 117-19).  When Petitioner learned what Adamczak had done, Petitioner was "upset" and indicated that he would "knock the hell out of him." (*Id.* at 119-20).

Skrzycki and Petitioner visited with Pete Peterson shortly thereafter.  (*Id.* at 123-25).  At one point, Peterson asked Petitioner, "what are you going to do if you see Vince?" (*Id.* at 125).  Petitioner responded that "he'd knock the hell out of him." (*Id.*).  Peterson replied, "I wouldn't knock the hell out of him, I'd kill him.  Those were heirlooms.  They belonged to your grandpa. And friends don't fuck friends." (*Id.* at 125-26).

Adamczak later showed up at Peterson's residence.  (*Id.* at 126).  Adamczak apologized to Petitioner for selling his grandfather's guns. (*Id.*).  Peterson, however, just kept repeating "friends don't fuck friends." (*Id.* at 127).  Petitioner and Peterson then began beating Adamczak.  (*Id.* at 127-28).  The beating eventually stopped at which point Skrzycki "figured everything was okay." (*Id.* at 128).

A few minutes later, Peterson repeated to Adamczak, "friends don't fuck friends." (*Id.* at 129).  Peterson then instructed Skrzycki to go in the house and pour everybody some wine. (*Id.*).  Skrzycki went inside but before she could return with the wine, Peterson entered the house and grabbed a weapon. (*Id.* at 129-30).  Before exiting the house, Peterson told Skrzycki, "stay in here for a while.  You don't need to come out right now." (*Id.* at 130).  Skrzycki remained inside. (*Id.* at 130-31).  After "a while," however, Skrzycki exited the house to retrieve her cigarettes. (*Id.* at 131-

32).  When she exited the house, Petitioner and Adamczak were sitting at a picnic table with Peterson standing nearby.  (*Id.* at 132).  The firearm was "leaning up against the picnic table."  (*Id.*).

Skrzycki lit a cigarette and was about to "grab [her] can of beer" when she heard Peterson again tell Adamczak, "friends don't fuck friends."  (*Id.*).  Peterson then pushed Adamczak to the ground and grabbed and shouldered his weapon.  (*Id.* at 132-33).  Peterson pointed the weapon at Adamczak, repeated, "friends don't fuck friends," and then shot Adamczak in the neck.  (*Id.* at 133-36).  Peterson then stated to Petitioner, "now you can dig the hole."  (*Id.* at 137).

Skrzycki "went off crazy" and began "running around the yard."  (*Id.*).  Skrzycki eventually fell down after which Peterson approached her.  (*Id.* at 135-36).  Peterson glared at Skrzycki and stomped on her ankle.  (*Id.* at 136).  Peterson then picked up a shovel and acted like he was going to strike Skrzycki in the head.  (*Id.*).  Petitioner approached Peterson and said, "don't do it, Pete.  Leave her alone.  She's not going to say nothing."  (*Id.*).  Peterson put the shovel down and told Petitioner to "get her the fuck up front."  (*Id.*).

Petitioner and Skrzycki returned to the front of the residence at which point Peterson stated, "you guys stay here."  (*Id.* at 137-39).  Peterson then drove away in Adamczak's vehicle.  (*Id.* at 139-41).  Peterson returned a short time later and instructed Petitioner, "you take her fucking home and you guys keep your mouths shut or I'll kill you like I did Vince."  (*Id.* at 142-43).

At approximately 5:30 a.m. the following morning, someone started banging on the window of Skrzycki and Petitioner's bedroom.  (*Id.* at 144).  Skrzycki looked outside and saw Peterson who responded, "I don't fucking want to see you.  I want to see [Petitioner]." (*Id.*).  Petitioner went to the window and briefly spoke with Peterson after which Petitioner got dressed and departed.  (*Id.* at 144-45).  Petitioner returned "over a half hour or so" later.  (*Id.* at 145).  When Skrzycki asked Petitioner "what's going on?", Petitioner replied, "the less you know, the better off you are."  (*Id.*).

**Jane Johnson**

Johnson, an attorney, was appointed to represent Rose Skrzycki after she was charged with murder.  (ECF No. 13-24; Trial Transcript, June 4, 2015, at 229-30).  Skrzycki always maintained to Johnson that Pete Peterson was the person who shot Vince Adamczak.  (*Id.* at 230-40).  The prosecution subsequently offered Skrzycki a plea bargain pursuant to which Skrzycki would plead guilty to being an accessory after the fact in return for her truthful testimony in the proceedings against Petitioner and Peterson.  (*Id.* at 233-34).  Johnson "insisted" that Skrzycki be allowed to plead no contest and that the record be temporarily sealed.  (*Id.* at 233-38).  Johnson "did not want [Skrzycki] to make any statements about the factual basis on the record" because Johnson "was very concerned for [Skrzycki's] safety" and, in fact, "feared for her life."  (*Id.* at 241).

**Christina Braun**

Braun was married to Petitoner's son, Joshua Braun.  (ECF No. 13-26; Trial Transcript, June 5, 2015, at 5, 11-12).  Braun recalled an incident in 2007-2008 in

which Petitioner and Rose Skrzycki got into a "fairly heated" argument. (*Id.* at 6-7). Braun asked Petitioner why he remained with Skrzycki if he was not happy. (*Id.* at 7). Petitioner responded that Skrzycki "had something hanging over his head." (*Id.* at 7-8). Petitioner further stated that when Skrzycki "gets mad," she "throws it in [his] face." (*Id.* at 8).

**Joshua Braun**

Braun is Petitioner's son. (ECF No. 13-26; Trial Transcript, June 5, 2015, at 11-12). Braun's parents divorced when he was four or five after which he and his two siblings lived with their mother, Sue Rehacek. (*Id.* at 12-14). When Braun was twelve years old, however, he began living with Petitioner while his two siblings remained with their mother. (*Id.* at 14).

When Braun was "fourteen or so," Petitioner asked Braun "if [he] knew what it was like to see your best friend's head get blown off." (*Id.* at 15-16). Braun did not respond after which Petitioner "proceeded to tell [Braun] how him and Vince got into a fight over some guns, and Pete asked him if he dug the hole, he'd pull the trigger, and [Petitioner] said yes." (*Id.* at 16-17). Petitioner related these events to Braun numerous times "over the following years." (*Id.* at 17-18). Braun later shared this information with his mother. (*Id.* at 17-18).

In the summer of 2014, Braun took his son to visit Petitioner. (*Id.* at 18-19). At one point, Braun began "talking about making plans later." (*Id.* at 19). In response, Petitioner "made the comment that if he had any more time, that he's gotten away with it 20 years longer than he thought he would." (*Id.*).

**James McCloughan**

As of June 21, 2011, McCloughan was employed as a Detective with the Michigan State Police. (ECF No. 13-26; Trial Transcript, June 5, 2015, at 97-98, 112). On this date, McCloughan interviewed Petitioner. (*Id.* at 98). As part of this process, McCloughan asked Petitioner to "write out in his own hand an account of what happened" regarding the death of Vince Adamczak. (*Id.* at 101-02).

In his written statement, Petitioner stated the following. On the day in question, he and Adamczak "started fighting. . .about some of his grandfather's guns." (*Id.* at 102). Pete Peterson later "started in on Vince about the guns." (*Id.*). Rose Skrzycki eventually went inside the house followed shortly thereafter by Peterson. (*Id.* at 103). Peterson returned with a gun and shot Adamczak. (*Id.*). Petitioner was standing approximately 40 yards away, with his back turned, when this occurred. (*Id.*). Skrzycki "became hysterical" and "took off running." (*Id.*). Peterson eventually caught up with Skrzycki and "injured her ankle to try to stop her from running and put a shovel to her throat." (*Id.*). Petitioner, however, "stopped Pete" from injuring Skrzycki further. (*Id.*). Peterson then "put [Petitioner] and Skrzycki in the house for two hours" while he "left with Vince's car and his body." (*Id.*).

At this point, Petitioner requested "some sort of immunity to talk further." (*Id.* at 103-04). The prosecuting attorney agreed to provide Petitioner with "full immunity for crimes against property" after which Petitioner spoke further with law enforcement. (*Id.* at 104-07). Petitioner then acknowledged that before Peterson shot Adamczak, he asked Petitioner, "are you going to dig the hole?" (*Id.* at 107).

Petitioner responded, "yeah." (*Id*.). Peterson then shot Adamczak "in the throat." (*Id*. at 107-08). The following day, Petitioner and Peterson attempted to dispose of Adamczak's body by burning it. (*Id*. at 108).

**Mary Waldecker**

Sometime in the fall of 2007, Waldecker attended a get-together at Petitioner's residence. (ECF No. 13-27; Trial Transcript, June 9, 2015, at 17-20). At some point, Petitioner stated, in a "boastful" fashion, that he "killed somebody." (*Id*. at 20-21). Petitioner further stated "don't talk about it. . .or you'll end up like Adamczak." (*Id*. at 20-22).

**Geralyn Cherrette**

For a brief period in 2007-2008, Cherrette was romantically involved with Petitioner. (ECF No. 13-27; Trial Transcript, June 9, 2015, at 40-41, 49). During this time, she spoke with one of Petitioner's former girlfriends about Vince Adamczak. (*Id*. at 41-42). Following this conversation, Cherrette described for Petitioner the story she had been told and then asked Petitioner "if it was true." (*Id*. at 42-44). Petitioner responded that it was "a lie." (*Id*. at 44-45). Cherrette did not believe Petitioner, however. (*Id*. at 45). Approximately one week later, Petitioner and Cherrette were "sitting around having a few beers." (*Id*.). Believing that Petitioner would "tell [her] more" because he was intoxicated, Cherette again asked Petitioner whether what she had been told was true. (*Id*.). Petitioner responded that it was true and described how he helped dispose of a body following a killing. (*Id*. at 46).

Petitioner later stated that "he wasn't the one who had killed Vincent, that it was Pete Peterson." (*Id.* at 46-48).

**Gloria Pomeroy**

Pomeroy began dating Petitioner in November 2011. (ECF No. 13-27; Trial Transcript, June 9, 2015, at 72-73). Petitioner eventually moved in with Pomeroy during which time he occasionally went hunting. (*Id.* at 73-74).

Following the presentation of evidence, the jury found Petitioner guilty of first-degree murder. (ECF No. 13-28, Trial Transcript, June 10, 2015, at 82-85). Petitioner was sentenced to serve life in prison without the possibility of parole. (ECF No. 13-30, Sentencing Transcript, August 20, 2015, at 24-25). Petitioner unsuccessfully sought relief in state court and now moves for habeas relief in this Court asserting the following claims:

    I.     Ineffective Assistance of Counsel

    II.    Prosecutorial Misconduct

    III.   Impermissible Admission of Bad Acts Evidence

    IV.   Violation of his Fourth Amendment Rights

    V.    Improper Prosecution

    VI.   Denial of the Right to Counsel

## STANDARD OF REVIEW

Knauss' petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

>   (d)    An application for a writ of habeas corpus on behalf of a person in
>   custody pursuant to the judgment of a State court shall not be granted
>   with respect to any claim that was adjudicated on the merits in State
>   court proceedings unless the adjudication of the claim —
>
>   (1)    resulted in a decision that was contrary to, or involved an
>   unreasonable application of, clearly established Federal law, as
>   determined by the Supreme Court of the United States, or
>
>   (2)    resulted in a decision that was based on an unreasonable
>   determination of the facts in light of the evidence presented in
>   the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). As the Supreme Court recently emphasized, this standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's

application thereof to be *objectively* unreasonable.  *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Ibid.*

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy either subsection therein.  This requirement, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 562 U.S. 86, 100 (2011).  Instead, if a state court rejects a federal claim, a federal habeas court "*must presume* that the federal claim was adjudicated on the merits." *Johnson v. Williams*, 568 U.S. 289, 301 (2013).  If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

## <u>ANALYSIS</u>

### I.    Fourth Amendment

As Detective Sergeant Mark Miller testified, on June 21, 2011, Petitioner was arrested on a misdemeanor warrant for driving on a suspended license.  Following his arrest, Petitioner was questioned about Vince Adamczak's killing and subsequently charged with his murder.  Petitioner argues that had it not been for his unlawful arrest, law enforcement would never have interviewed him and learned where Adamczak was killed and where his body was burned.  Petitioner argues that the evidence law enforcement obtained based on his statements is, therefore, inadmissible as fruit of the poisonous tree.  Petitioner argues that, as a result, his "conviction must be vacated."

In *Stone v. Powell*, 428 U.S. 465 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."   *Id.* at 482.  Accordingly, habeas review of a Fourth Amendment claim is precluded where the petitioner was afforded an "opportunity for full and fair consideration" of his Fourth Amendment claims in state court.  *See, e.g., Good v. Berghuis*, 729 F.3d 636, 637-38 (6th Cir. 2014).

This standard requires the Court to undertake a two-part inquiry.  The Court must first determine whether the state procedural mechanism, in the abstract, afforded Petitioner "the opportunity" to assert a Fourth Amendment claim.  *See*

*Terrell v. Sheldon*, 841 Fed. Appx. 861, 862 (6th Cir., Jan. 13, 2021).  Second, the Court must determine whether "presentation of the claim was in fact frustrated because of a failure of that mechanism." *Ibid.*

It is beyond dispute that the State of Michigan has a procedural mechanism that affords criminal defendants a full and fair opportunity to assert a Fourth Amendment claim prior to trial.  *See, e.g., Manning v. Brewer*, 2017 WL 8942569 at *8 (W.D. Mich., Dec. 6, 2017) (recognizing that following *Mapp v. Ohio*, 367 U.S. 643 (1961), the Michigan courts "consistently have acknowledged their duty, under both the federal and state constitutions, to suppress evidence seized in violation of the Fourth Amendment").   Petitioner presents neither argument nor evidence that his ability to present his alleged Fourth Amendment claims to the trial court was frustrated.  Accordingly, this claim is not cognizable and presents no basis to grant Petitioner relief.

## II.    Voluntariness of Statements to Law Enforcement

As previously noted, following his arrest in June 2011, Petitioner spoke with law enforcement and made numerous incriminating statements.  Petitioner argues that he is entitled to relief because his statements to law enforcement were improperly admitted into evidence.   Specifically, Petitioner argues that his statements were inadmissible because he was promised "full immunity" by law enforcement and, furthermore, because he was denied the right to counsel during his interrogation.

Petitioner moved, prior to trial, to suppress the statements in question.  In response, the trial court conducted a lengthy hearing at which testimony was presented and cross-examination permitted.  (ECF No. 13-11, Hearing Transcript, May 1, 2015; ECF No. 13-12, Hearing Transcript, May 12, 2015).

Detective Sergeant Mark Miller testified as follows.  Prior to interviewing Petitioner, Miller advised Petitioner of his *Miranda* rights.  (ECF No. 13-11, Hearing Transcript, May 1, 2015, at 26-28).  Petitioner acknowledged that he understood his rights and nevertheless agreed to speak about Vince Adamczak's death.  (*Id.* at 28). Petitioner did not appear to be impaired or experiencing any distress.  (*Id.* at 28-29). The interview with Petitioner began after 1:00 p.m. and continued until approximately 4:00 p.m.  (*Id.* at 26-32).  Petitioner was then transported to the Grayling Crime Lab located "a little bit more than an hour drive" away because Petitioner agreed to participate in a polygraph examination.  (*Id.* at 31-32).  Petitioner was afforded the opportunity to make a telephone call, was permitted to use the bathroom, and was provided food and drinks.  (*Id.* at 53-54).

Detective James McCloughan testified as follows.  McCloughan met Petitioner at the Grayling Crime Laboratory at approximately 5:20 p.m.  (ECF No. 13-11, Hearing Transcript, May 1, 2015, at 71-73).  McCloughan first provided Petitioner with an "overview" of the polygraph process.  (*Id.* at 74-77).  McCloughan then advised Petitioner of his *Miranda* rights.  (*Id.* at 77-78).  Petitioner acknowledged that he understood his rights and agreed to waive them and speak with McCloughan.  (*Id.* at

78-79).  Petitioner did not appear to have been "mistreated," he appeared "rational," and exhibited no difficulties communicating.  (*Id.* at 79-82).

Before conducting the polygraph, McCloughan had Petitioner provide a written statement concerning his knowledge or involvement in the killing of Vince Adamczak. (*Id.* at 82-84).  McCloughan used Plaintiff's written statement to help develop the questions he would ask during the polygraph examination.  (*Id.* at 84-86).  Prior to administering the polygraph examination, however, Petitioner "said he wanted some sort of immunity." (*Id.* at 87).  McCloughan did not have authority to grant Petitioner immunity, however.  (*Id.*).  McCloughan and Detective Sergeant Miller approached the prosecutor about the matter who agreed to extend to Petitioner "immunity for crimes against property." (*Id.* at 87-88).

Petitioner requested that the immunity agreement be reduced to writing.  (*Id.* at 88).  McCloughan complied and provided Petitioner with a signed and dated statement as follows: "Robert Knauss, you have full immunity for crimes against property per my discussion with Prosecutor Stone."[2]  (*Id.* at 88-89).  After receiving this agreement, Petitioner stated that he "wanted to understand what [the agreement] meant." (*Id.* at 89).  Petitioner then "reached over and grabbed the mouse [to McCloughan's computer] and said to [McCloughan] this is property." (*Id.*). McCloughan responded, "you're absolutely correct and you have full immunity for crimes against property." (*Id.*).  Satisfied that Petitioner understood the nature and

---

2 A copy of Plaintiff's immunity agreement is contained in the record.  (ECF No. 13-36 at PageID.2085).

scope of the immunity agreement, McCloughan proceeded with his polygraph examination the results of which reflected "deception" by Petitioner.  (*Id.* at 89-90). Following the polygraph examination, Petitioner spoke with McCloughan, making additional incriminating statements.  (*Id.* at 91-93).

Petitioner also testified at the hearing.  Petitioner asserted that he requested and received "full immunity" before agreeing to speak with law enforcement.  (ECF No. 13-12, Hearing Transcript, May 12, 2015, at 82-84).  According to Plaintiff, he later requested a lawyer, but his request was denied on the ground that he had "full immunity."  (*Id.* at 84-89).  Instead, Petitioner was also instructed that he "had nothing to worry about because they [knew Petitioner] wasn't the one that pulled the trigger."  (*Id.* at 85-86).

Petitioner asserted that he was unable to read words "over five letters" and was under the influence of drugs when he spoke with law enforcement.  (*Id.* at 90-92).  Petitioner further asserted that he was denied the use of a telephone for three days following his arrest.  (*Id.* at 94).  When confronted, however, with jail records contradicting this assertion, Petitioner retreated and asserted that he "might have been able" to make telephone calls following his arrest sooner than he asserted.  (*Id.* at 110).  Petitioner also conceded that he received a written document outlining his immunity agreement.  (*Id.* at 91).  Petitioner further acknowledged that officers had informed him of his *Miranda* rights.  (*Id.* at 99).

Based on this testimony, the trial judge concluded that, considering the totality of the circumstances, Petitioner's statements to law enforcement were voluntary and, therefore, admissible.  (ECF No. 13-12, Hearing Transcript, May 12, 2015, at 173-79). Specifically, the judge concluded that Petitioner possessed "adequate intelligence" and "was well aware of his rights."  (*Id.* at 174).  As the judge noted, Petitioner "even came up with the concept of immunity, which is a legal concept that one would have to have some intelligence to understand."  (*Id.*).

Finding Plaintiff's testimony not credible, the judge determined that Petitioner "was advised of his constitutional rights" and "did not make a demand for counsel." (*Id.* at 174-76).  The judge found that Petitioner did not experience any "unnecessary delay" between the time of his arrest and his initial appearance before a judicial officer.  (*Id.* at 176-77).  The judge further found that Petitioner was not "injured, intoxicated, drugged or ill" or "deprived of food, sleep or medical attention" when he made the statements in question.  (*Id.* at 177).  On the question of immunity, the judge determined that the scope of the immunity offered to Petitioner was limited to "property crimes" as articulated in the written document law enforcement provided to Petitioner.  (*Id.* at 177-78).

The standard, under federal law, by which the voluntariness of confessions is assessed is well established.  As the Sixth Circuit recently observed:

> Under clearly established Supreme Court law, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment."  The "tactics for eliciting inculpatory statements  must  fall  within  the  broad  constitutional  boundaries

imposed by the Fourteenth Amendment's guarantee of fundamental fairness." To determine whether the will of the defendant was overborne at the time he confessed, courts must consider the totality of the circumstances surrounding the confession, "both the characteristics of the accused and the details of the interrogation." "Factors considered in assessing the totality of the circumstances include the age, education, and intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep."

*Bays v. Warden, Chillicothe Correctional Institution*, 807 Fed. Appx. 481, 486-87 (6th Cir., Mar. 30, 2020) (citations omitted).

Petitioner, in his state court post-conviction motion for relief, argued that the admission of his statements to law enforcement violated his constitutional rights. The trial court rejected this argument concluding that Petitioner's "arguments are not supported by the record or any reasonable application of the law." (ECF No. 13-35 at PageID.2030). Petitioner's subsequent motion for reconsideration of this decision was denied. (ECF No. 13-38 at PageID.2565-67). Likewise, the Michigan Court of Appeals and Michigan Supreme Court denied Petitioner leave to appeal this issue. (ECF No. 13-38 at PageID.2450; ECF No. 13-40 at PageID.2752). The decision by the trial court rejecting this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

III.   **Bad Acts Evidence**

Petitioner asserts that the "trial court allowed evidence of multiple unrelated bad acts by [Petitioner]."   Specifically, Petitioner argues that "the jury received evidence of many instances of unrelated bad acts by [Petitioner], including child abuse, spouse abuse, criminal convictions, illegal weapons possession, drunkenness and general violence and lawlessness."   Petitioner argues that introduction of this evidence denied him of the right to a fair trial.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding.   *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).   Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).   This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error.   *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).   Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States.   *Id.*   In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief."   *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).

Fundamental fairness does not "require a perfect trial," *Clemmons*, 34 F.3d at 358, and, moreover, courts have defined those violations which violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512.  State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.*  As is well recognized, however, the United States Supreme Court has never held that a state violates due process by permitting propensity evidence in the form of other bad acts evidence.  *Bugh*, 329 F.3d at 512-13 ("there is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence").

As the Sixth Circuit recently observed, given the absence of clearly established Supreme Court precedent that it violates due process to allow the type of evidence presently being challenged, habeas relief cannot be granted because "there is no Supreme Court precedent that the state court's decision could be deemed contrary to." *Stewart v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020).  In sum, there does not exist any clearly established Supreme Court authority holding that the admission of evidence of prior bad acts violates the Constitution, laws, or treaties of the United States.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

## IV.   Prosecutorial Misconduct

Petitioner asserts several allegations of prosecutorial misconduct.  Specifically, Petitioner alleges that the prosecutor violated his right to a fair trial in the following ways: (1) eliciting bad acts evidence; (2) eliciting testimony that Rose Skrzycki accused Petitioner of shooting Vince Adamczak; (3) making improper statements during jury selection; (4) improperly vouching for the credibility of witnesses; and (5) improperly appealing to juror sympathy.

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor." *Cockream v. Jones*, 382 Fed. Appx. 479, 484 (6th Cir., June 29, 2010) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see also*, *Givens v. Yukins*, 2000 WL 1828484 at *6 (6th Cir., Dec. 5, 2000) ("[t]he aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused") (quoting *Phillips*, 455 U.S. at 219).  Thus, even if the challenged comments were improper, habeas relief is available only where the comments were "so flagrant as to render the entire trial fundamentally unfair." *Gillard*, 445 F.3d at 897.

When assessing whether alleged prosecutorial misconduct warrants relief, the Court undertakes a two part analysis.  The Court must first determine whether "the prosecutor's conduct and remarks were improper." *Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007).  If such is the case, the Court must then determine "whether the impropriety was flagrant and thus warrants reversal."  *Id.* at 759.  When assessing whether an improper comment resulted in a denial of the right to a fair trial, the Court considers the following factors: (1) the likelihood that the comments mislead the jury or prejudiced the accused; (2) whether the comments were extensive or isolated; (3) whether the comments were deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial.  *Id.*

A.    Bad Acts Evidence

Petitioner argues that the prosecutor "elicited evidence of bad acts committed by [Petitioner], including testimony of child abuse, spousal abuse, brawling, unrelated crimes, probation violations and illegal weapons possession." (ECF No. 1-2 at PageID.79).  The evidence to which Petitioner objects is as follows.

Matthew Kemp, who worked as a bouncer at a bar Petitioner frequented, testified that he had "never known [Petitioner] to be sober." (ECF No. 13-24, Trial Transcript, June 4, 2015, at 55-56).  Kemp also testified that he had "thrown [Petitioner] out of the bar many a times." (*Id.* at 48).  Joshua Braun testified that Petitioner, over a "two to three" year period, "slap" and "hit" him if he said something Petitioner "didn't like." (ECF No. 13-24, Trial Transcript, June 5, 2015, at 39-40). Mary Waldecker testified that one on occasion Petitioner "and his son" "beat up" her

ex-husband.  (ECF No. 13-27, Trial Transcript, June 9, 2015, at 23).  Petitioner's counsel did not object to any of this testimony.

The Michigan Court of Appeals rejected this claim, noting that Petitioner "actually used the challenged evidence at trial, arguing that it showed that while [Petitioner] was a brawler and had a tendency to get in trouble with the law, he was simply not a killer." *People v. Peterson*, 2017 WL 5759698 at *6 (Mich. Ct. App., Nov. 28, 2017).  The court further concluded that it was "unlikely that the evidence diverted the jury from an objective appraisal of [Petitioner's] guilt or innocence in light of [Petitioner's] many incriminating statements to acquaintances and police." *Ibid.*  This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

B.    Rose Skrzycki

Petitioner next argues that it was improper for the prosecutor to elicit testimony that Rose Skrzycki "had accused [Petitioner] of shooting Vince [Adamczak]."  (ECF No. 1-2 at PageID.79).  Petitioner argues that this was improper because the evidence was "almost certainly false."  (*Id.*).

It has long been recognized that "the knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *Brooks v.*

*Tennessee*, 626 F.3d 878, 894-95 (6th Cir. 2010) (quoting *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998)).  To establish that testimony violates this precept, Petitioner must show that (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false.  *Brooks*, 626 F.3d at 894-95 (quoting *Bell*, 161 F.3d at 343).  Petitioner's claim fails because he cannot demonstrate that the challenged testimony was false.

Detective Sergeant Mark Miller testified that Rose Skrzycki initially stated that Petitioner and Pete Peterson both shot Vince Adamczak.  (ECF No. 13-20; Trial Transcript, June 2, 2015, at 212; ECF No. 13-22, Trial Transcript, June 3, 2015, at 24-29).   When Skrzycki testified, she acknowledged initially stating to law enforcement that Petitioner and Peterson both shot Adamczak.  (ECF No. 13-24; Trial Transcript, June 4, 2015, at 158-68).   Skrzycki's testimony supports Detective Sergeant Miller's testimony.  Petitioner has presented no evidence even suggesting that Miller's testimony was false.

The Michigan Court of Appeals rejected this claim on the ground that "[e]ven assuming that Skrzycki's prior statements were false, the trial testimony that she previously made such statements has not been shown to be false."  *Peterson*, 2017 WL 5759698 at *6.  The court further observed that "the testimony regarding Skrzycki's prior statements was not offered to prove that [Petitioner] shot Adamczak.  Rather, it was elicited as part of presenting the jury with a complete account of the police interrogations of Skrzycki, demonstrating that she had changed her story multiple

34

times and ultimately recanted her assertion that [Petitioner] had shot Adamczak."
*Ibid.*  This decision is neither contrary to, nor involves an unreasonable application
of, clearly established federal law.  Furthermore, this decision was not based on an
unreasonable determination of the facts in light of the evidence presented.
Accordingly, this claim raises no issue upon which habeas relief may be granted.

    C.    Jury Selection – Improper Statements

    During jury selection, the prosecutor, Douglas Baker, participated in the
following exchange with several potential jurors:

| | |
|---|---|
| Mr. Baker: | If you get that instruction on aiding and abetting, then you look at the facts and you decide, well, did that meet aiding and abetting.  Did that meet premeditation.  Did that meet whatever the rule is.  So you're finding the facts as it applies to the law that the Court gives you.  You think you can all do that? |
| Juror Tabora-Cortez: | Yes. |
| Mr. Baker: | Anybody so far from just from what you're gleaning about the case, anybody have an issue or problem with their ability to be fair and impartial?  You know, it's a murder case, 1995, what evidence, anything?  If you do along the way, just let know so we can talk about it.  Let me ask Ms. Ostrander.  Is it at least imaginable to you that a person could admit their role in a crime? |
| Juror Ostrander: | Uh-huh. |
| Mr. Baker: | We call than an admission.  Sometimes it can be called a confession.  Have you ever heard the phrase ***confession is good for the soul***? |
| Juror Ostrander: | Yes. |

| | |
|---|---|
| Mr. Baker: | Is it at least imaginable to you, Mr. Bagley, that somebody could talk to a trusted friend, relative, confidant about what they did wrong? |
| Juror Bagley: | Sure. |
| Mr. Baker: | All right.  And they may h            ave a variety of reasons, correct? |
| Juror Bagley: | Yeah. |
| Mr. Baker: | What might some of them be in your opinion? |
| Juror Bagley: | Why they talk to them? |
| Mr. Baker: | Yeah, just in general. |
| Juror Bagley: | A friend maybe sees it their way.  Maybe they agreed with them or didn't agree with them. |
| Mr. Baker: | It might be bragging? |
| Juror Bagley: | Bragging, yeah, sure. |
| Mr. Baker: | Might be remorseful? |
| Juror Bagley: | (nodding) |
| Mr. Baker: | There might be a number of reasons why someone would start talking, right? |
| Juror Bagley: | Yeah. |
| Mr. Baker: | Do you understand that that admission-type evidence is evidence that you can weigh, decide how much weight you want to give it?  Does everybody understand that? |
| Jurors: | (nodding) |

36

Mr. Baker:          Okay.  Anybody have any quarrel or issue with that sort of rule of law that admissions, statements that are made, whether it's to the police or whether it's to friends or family, can be heard by you?  ***We don't speak lightly against ourselves***, do we?  We don't lightly admit – say we committed crimes if we didn't, correct?  So you can hear that testimony.  Do you understand that?

Jurors:             (nodding)

(ECF No. 13-19, Trial Transcript, May 28, 2015, at 118-20).

Petitioner argues that by making the two statements italicized and bolded above, the prosecutor "crossed [the] line" and deprived him of the right to a fair trial. Understood in context, it is not reasonable to argue that the challenged comments denied Petitioner a fair trial.  The comments were brief and part of a larger discussion intended to assess whether the jurors were willing to properly consider inculpatory statements which somebody may have made to others.  The undersigned fails to discern how the challenged comments could have prejudiced Petitioner as the prosecutor expressly noted that the jurors were required to follow the court's instructions and had the discretion to afford as much – or as little – weight to such evidence as they saw fit.

The Michigan Court of Appeals rejected this claim on the ground that the prosecutor's statements were neither improper nor prejudicial in light of the evidence supporting his guilt.  *Peterson*, 2017 WL 5759698 at *6.  This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of

37

the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

     D.     Jury Selection - Attacking Defense Counsel

The prosecutor later engaged in the following exchange with several potential jurors:

| | |
|---|---|
| Juror Pointer: | That's where you get the premeditated. |
| Mr. Baker: | Yeah.  Did you weigh it out?  'Why' you did that, you can hear it if there's that evidence.  But ultimately that's not proof needed to be proven beyond a reasonable doubt.  Because sometimes that's locked in somebody's heart and we're never going to know why somebody does what they do, you know.  You can hear sometimes the evidence, but the why sometimes is not accessible.  Do you follow that? |
| Juror Pointer: | Uh-huh. |
| Mr. Baker: | So intent, yes.  Premeditation, yes.  Ultimately why, you can hear the evidence if it's out there.  You can, you know, figure it in with everything else, but it's not going to be a[n] element.  I don't have to prove that.  I don't mind proving what I have to beyond a reasonable doubt, but I don't want to be held having to prove things I don't have to prove beyond a reasonable doubt.  You follow me? |
| Juror Pointer: | Yes. |
| Mr. Baker: | And, again, I'll just ask you, do you know, and I'll – Mr. Sedelmaier. |
| Juror Sedelmaier: | Yes. |
| Mr. Baker: | Does it sound odd to you that a prosecutor has – nowhere in this country in our system has a |

|                     |                                                                                                                                                                                                                                                                                           |
|---------------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                     | prosecutor ever convicted anyone of a crime?  Does that sound odd to you?                                                                                                                                                                                                                  |
| Juror Sedelmaier:   | No.                                                                                                                                                                                                                                                                                        |
| Mr. Baker:          | Okay.  Prosecutors don't convict.                                                                                                                                                                                                                                                          |
| Juror Sedelmaier:   | Correct.                                                                                                                                                                                                                                                                                   |
| Mr. Baker:          | Who convicts?                                                                                                                                                                                                                                                                              |
| Juror Sedelmaier:   | The People.                                                                                                                                                                                                                                                                                |
| Mr. Baker:          | Right.  The juries, or judge if there is no jury in a case.  Prosecutors never convict.  Juries never sentence.  That's not your job.  Whose job is that?                                                                                                                                   |
| Juror Sedelmaier:   | The judge.                                                                                                                                                                                                                                                                                 |
| Mr. Baker:          | The judge.  We all have a division of labor.  We all have a role.  ***I present.  The defense argues his client's interests***.  And the judge gives law.  It's not all centralized.  There's like a division of authority or power that way.  Your job as jurors is not to try to do other jobs, it's just to decide the facts of the case.  Does that make sense to you? |

(ECF No. 13-19, Trial Transcript, May 28, 2015, at 127-28).

Petitioner argues that by making the statement italicized and bolded above, the prosecutor improperly "denigrated the defense."  Again, understood in context, it is not reasonable to argue that the challenged comment "denigrated the defense."  The prosecutor was merely articulating for the jury its proper role.

The Michigan Court of Appeals rejected this claim.  *Peterson*, 2017 WL 5759698 at *6-7.  This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an

39

unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

E.      Closing Argument - Vouching for the Credibility of Witnesses

During his closing argument, the prosecutor stated the following:

> Let me begin by telling you that ***I think, sincerely believe, that we – that the evidence in this case has proven Robert Scott Knauss guilty*** of first degree murder and has proven Pete Peterson guilty of first degree murder.  That they were acting together, hand in glove, to take this person's life.  And I'm not just going to say that because I'm the prosecutor.  I'll point to the evidence that backs those statements up as we go through this.

(ECF No. 13-28, Trial Transcript, June 10, 2015, at 22-23).

Petitioner argues that the italicized and bolded portion of the prosecutor's comments constitute improper vouching for witnesses.  Improper vouching occurs when a prosecutor "supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [government] behind that witness." *Wogenstahl v. Mitchell*, 668 F.3d 307, 328 (6th Cir. 2012).  Here, the prosecutor did not comment on the credibility of a witness, but instead merely argued, albeit unartfully, that the State had met its burden to demonstrate that Petitioner was guilty.  Moreover, the prosecutor premised his statement on the evidence presented at trial rather than merely his personal belief.

The Michigan Court of Appeals rejected this claim. *Peterson*, 2017 WL 5759698 at *7.  This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an

40

unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

F.    Closing Argument - Appealing to Juror Sympathy

During his closing argument, the prosecutor also stated the following:

I do want to thank you.  You know, this is Vince's trial, too.  You know, I know we talked about [Petitioner's] trial and Pete's trial, and that's true, but it's also Vince's trial.

And, you know, he's not here, of course.  Maybe he's in a better place. Some of us believe that.  Maybe he's watching us to see if he's going to be abandoned once again.  I don't think so.  But he certainly lives, if not in that sense, through people – we live through our loved ones.  We see ourselves in our parents, our children, our brothers and sisters.  We're still there in some sense.  Vince is here through his sister Carol, who's in court, and this is their trial, too.

And we can't – you know, you are representatives of the community and forces of the law, and we can't abandon him.  He's not a disposable person.  There has to be accountability for what was done, even though it's years later.

So we've done all we can do.  The police have, soon the lawyers have, the courts have, and it's all coming down to you.  **You're the last link in the chain of law enforcement**.  And you're going to say what the truth is in this case.  And it's our belief and our hope that the right decision will pronounce Robert Scott Knauss guilty of this, accountable for this.

(ECF No. 13-28, Trial Transcript, June 10, 2015, at 45-46).

Petitioner argues that the italicized and bolded portion of the prosecutor's comments constitute "improper appeals to jury sympathy."  It is not improper for a prosecutor to encourage a jury to "act as the community conscience."  *Harris v. McKee*, 2014 WL 12972128 at *2 (6th Cir., Sept. 30, 2014).  Likewise, "nothing prevents the government from appealing to the jurors' sense of justice."  *United States v. Hall*, 979

F.3d 1107, 1122 (6th Cir. 2020).  It is when a prosecutor goes further, however, and makes arguments "calculated to incite the passions and prejudices of the jurors" or invites the jury to convict "based on their fear for community safety" that a violation of the right to a fair trial occurs.  *Ibid.*  For example, a prosecutor "may not urge jurors to identify individually with the victims" or "fan the flames of the jurors' fears by predicting that if they do not convict, a crime wave or some other calamity will consume their community."  *Ibid.*

The remark in question does not come close to crossing this line.  The prosecutor merely appealed to the jury's sense of justice and reminded them that, following closing arguments and instructions from the judge, the matter would be theirs to resolve.  The prosecutor's comments did not violate Petitioner's right to a fair trial.  The Michigan Court of Appeals rejected this claim.  *Peterson*, 2017 WL 5759698 at *7.  This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

## V.    Ineffective Assistance of Counsel

Petitioner argues that both his trial and appellate attorneys rendered ineffective assistance in violation of his constitutional rights.  Specifically, Petitioner alleges that his trial attorney was ineffective in the following ways: (1) failing to

advance an intelligible defense; (2) failing to object to inadmissible evidence; (3) failing to conduct effective cross-examination; (4) making inappropriate statements to the jury; (5) being so deficient that he was effectively absent from trial; (6) failing to object to Petitioner's unlawful arrest; (7) failing to enforce the agreement to afford "full immunity" to Petitioner; (8) failing to enforce Petitioner's right to counsel when he was being interviewed by law enforcement.  With respect to his appellate counsel, Petitioner argues that counsel was ineffective for failing to assert on appeal the issues Petitioner asserted in his post-conviction motion for relief from judgment filed in the trial court.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom.  *See Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).  To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness."  *Premo*, 562 U.S. at 121 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).  A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Premo*, 562 U.S. at 121 (quoting *Strickland*, 466 U.S. at 689).  Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Premo*, 562 U.S. at 121-22 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.  Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Premo*, 562 U.S. at 122 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).  The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo*, 562 U.S. at 122 (quoting *Strickland*, 466 U.S. at 690).  This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one." *Premo*, 562 U.S. at 122.  Likewise, the standard by which petitions for habeas relief are judged is "highly deferential."  Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential. *Ibid.* (citations omitted).  As the *Premo* Court concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The

> question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 122-23 (internal citations omitted).

A.    Trial Counsel

1.    Failure to Present an Intelligible Defense

Petitioner argues that his attorney "failed to present an intelligible defense" and "never articulated a plausible theory of the case."  The trial court conducted a lengthy *Ginther* hearing to explore Petitioner's ineffective assistance of counsel claims.  At this hearing, Petitioner's trial counsel testified that his trial strategy was that Petitioner "was there" and "witnessed" Adamczak's murder, but did not participate in any way, except for he was part of the disposal and that was because he was in fear."  (ECF No. 13-32, Hearing Transcript, Nov. 8, 2016, at 196).  Counsel further indicated that he intended to seek an instruction giving the jury an option to find Petitioner guilty of the lesser included offense of being an accessory after the fact.  (*Id.* at 197-99).

Counsel made comments, however, during his opening statement that were not necessarily consistent with this strategy.  Specifically, counsel appeared to suggest that because Adamczak was a "free spirit," who often traveled to places like Arizona and Alaska without telling people, he might actually still be alive.  (ECF No. 13-20, Trial Transcript, June 2, 2015, at 81-82).  As for the instruction counsel intended to request, as the trial judge observed in his Opinion denying Petitioner's motion for

new trial, "Michigan law does not permit such an instruction." (ECF No. 13-34 at PageID.2015).

The trial judge found that counsel's performance in this regard was deficient. (*Id.* at PageID.2011-16). The judge concluded, however, that counsel's failure in this regard did not prejudice Petitioner's defense. The judge noted that "the evidence that was presented, and that could not be blocked by [Petitioner], was that he actively participated in the disposal of Mr. Adamczak's body." (*Id.* at PageID.2015). The judge further observed that while counsel mistakenly believed he could obtain a lesser included offense instruction "focusing on [Petitioner's] conduct as being only an accessory after the fact is not inconsistent with a defense that [Petitioner] was not guilty of first degree murder." (*Id.*).

As the judge further concluded, the "evidence against [Petitioner] that was not affected by [counsel's] errors was more than adequate to convict." (*Id.* at PageID.2023). Specifically, the judge noted (1) testimony from Rose Skrzycki implicating Petitioner; (2) Petitioner's numerous admissions to others; (3) Petitioner's statements to law enforcement; (4) evidence that Petitioner was angry with Adamczak and physically assaulted him immediately prior to his killing; (5) evidence that Petitioner agreed to dig a hole to dispose of Adamczak's body if Pete Peterson shot him. (*Id.*). As the judge concluded:

> The totality of the evidence of guilt against [Petitioner] was little affected by counsel's errors. The heart of the Attorney General's case was the eye witness testimony and [Petitioner's] admissions. There was

not such a breakdown of the adversary process as to render the result unreliable.  [Petitioner] was not deprived of a fair trial.

(*Id.* at PageID.2023-24).

2.    Failing to Object to Inadmissible Evidence

As previously discussed, Petitioner argues that certain bad acts evidence was improperly admitted against him.  Petitioner argues that it constituted deficient performance for his trial attorney to fail to object to the admission of this testimony.

At the *Ginther* hearing, Petitioner's counsel asserted that he did not object to the evidence in question because it supported his theory that Petitioner was a "brawler," but not a murderer.  (ECF No. 13-32, Hearing Transcript, Nov. 8, 2016, at 220).  The trial judge nonetheless found that counsel's performance in this regard was deficient because counsel failed to actually argue this theory to the jury which resulted in the disputed evidence giving "the impression to the jury that [Petitioner] was a violent, bad actor."  (ECF No. 13-34 at PageID.2012-13, 2018).

The trial judge, however, determined that Petitioner was not prejudiced by his attorney's performance.  The judge concluded that properly admitted evidence established that Petitioner "was angry with Adamczak" and ultimately "engaged in a physical confrontation with Adamczak."  (*Id.* at 2021-22).  The judge further observed that Petitioner "encouraged the homicide" by telling Peterson he would dig a hole if Peterson shot Adamczak.  (*Id.* at PageID.2022).  Finally, the judge observed that even had the evidence in question not been admitted, the jury would still have known about Petitioner's previous criminal involvement and his involvement with the

47

disposal and burning of Adamczak's body.  (*Id.*).  As the judge put it, Petitioner "would not have been seen, even without the errors of counsel, as a[n] upstanding citizen." (*Id.*).  Furthermore, as previously noted, the evidence of Petitioner's guilt was substantial.

### 3.    Failing to Conduct Effective Cross-Examination

Petitioner argues that his counsel failed to effectively cross-examine several witnesses.  Specifically, Petitioner argues that his counsel failed to impeach Joshua Braun's credibility "with evidence of past theft crimes" and failed to cross-examine Detective Sergeant Miller "regarding the multiple, shifting stories told about the murder over the years and about other possible suspects."  Petitioner also advances vague arguments that his counsel simply should have been more effective.

While Petitioner may subjectively be dissatisfied with his attorney's cross-examination efforts, Petitioner offers absolutely nothing which suggests that he was prejudiced by his attorney's shortcomings.  Petitioner offers no evidence that Joshua Braun committed any "past theft crimes" or that cross-examination regarding such could have advanced his position.  Likewise, Petitioner offers no evidence suggesting that different or more effective cross-examination of Detective Sergeant Miller would have advanced his cause.  Finally, with respect to his vague dissatisfaction with his attorney's performance, Petitioner offers nothing to support his belief that his attorney could have more effectively cross-examined witnesses or that it would have

48

advanced his position.   Petitioner's generalized dissatisfaction with his counsel's performance simply is insufficient to establish prejudice under *Strickland*.

The trial judge rejected this claim, noting that Petitioner "does not point out any area of cross-examination that could have been pursued that would have been successful and ultimately affected the outcome of the trial."  (ECF No. 13-34 at PageID.2014).  As the trial judge further concluded, however, even if Petitioner had made such a showing, he could not demonstrate prejudice resulting therefrom because the evidence of his guilt was substantial.

4.    Making Inappropriate Statements to the Jury

Petitioner next argues that he is entitled to relief because his counsel's performance during jury selection was deficient.  Specifically, Petitioner asserts that his attorney's questioning of potential jurors was "clumsy, confused and outright strange."  (ECF No. 1-3 at PageID.103).  While Petitioner has identified a handful of isolated comments that even if properly characterized as "clumsy, confused and outright strange," these comments do not inherently reflect deficient performance.  Moreover, these isolated comments are not inherently prejudicial.  Petitioner offers neither argument nor evidence suggesting otherwise.  Again, Petitioner's general dissatisfaction with his attorney's performance is insufficient to obtain relief.

The trial judge rejected this claim concluding as follows:

It is true that [counsel] did ask one juror a question: 'you're a glass of water?", to which the juror responded "what does that mean?"  [Counsel] moved on.  Further, [counsel] did make a mistake in believing that one of the jurors was on active duty military duty, but he was corrected and

made an appropriate apology.  Other than those incidents, [counsel] participated in voir dire, and asked questions primarily with respect to the burden of proof and the presumption of innocence.  He challenged jurors for cause.  He exercised peremptory challenges, and regularly made the point with jurors that they understood the burden of proof, and the presumption of innocence by asking them to respond to the question: "what is the standard."  There is nothing about the voir dire process that was out of the ordinary, other than the two incidents above.  This Court is mindful that often times attorneys attempt to introduce their "theory of the case" during the course of voir dire.  However, failing to do so is not improper representation, and perhaps doing so is objectionable if it exceeds reasonable bounds of inquiry into a juror's suitability for the case.  [Petitioner] presents nothing that demonstrates that he was prejudiced by the two misstatements and there is nothing that supports ineffectiveness by [counsel] in the conduct of voir dire.

(ECF No. 13-34 at PageID.2010-11).[3]

5.    Complete Denial of Counsel

In *United States v. Cronic*, 466 U.S. 648 (1984), the Supreme Court recognized that when "counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding" prejudice from such is to be presumed.  *Id.* at 659 n.25.  Citing to *Cronic*, Petitioner asserts that he is entitled to relief because his trial counsel was "effectively absent from trial."  (ECF No. 1-3 at PageID.113-15).

Petitioner does not argue that he was denied counsel or without counsel at any critical stage of his proceeding.  Rather, Petitioner simply argues that his attorney's general performance was so deficient that he was effectively denied counsel.  The presumption of prejudice which *Cronic* recognizes, however, "is reserved for

_____

3 The trial judge's observations are consistent with the record of voir dire.  (ECF No. 13-19, Trial Transcript, May 28, 2015, at 3-263).

50

situations where the external circumstances – whatever their origin – are so crushingly egregious that they render counsel effectively absent." *United States v. Poulin*, 2014 WL 1642269 at *37 (D. Maine, Apr. 24, 2014). Petitioner fails to identify or articulate any such circumstances, but instead merely laments the general argument that counsel "failed to subject the prosecution's case to meaningful adversarial testing." As previously noted, however, the trial judge rejected this particular argument, explicitly finding no breakdown in the adversarial process.

6.     Failing to Object to Plaintiff's Unlawful Arrest

As previously noted, Petitioner was arrested, pursuant to an arrest warrant, for driving while his license was suspended. Petitioner never disputed the accuracy of this charge. Instead, Petitioner argues that because driving while license suspended is a "civil infraction," it was unlawful to arrest him pursuant to an arrest warrant. Petitioner argues, therefore, that his trial counsel was ineffective for failing to challenge his arrest. (ECF No. 1-4 at PageID.254). Specifically, Petitioner argues that "he would never have never been convicted, and sentenced to prison for life, if the illegal arrest warrant would have been thrown out prior to trial." (*Id.*).

As the trial judge articulated, however, Petitioner's argument is premised on a "misunderstanding" of the applicable Michigan law. (ECF No. 13-35 at PageID.2029). As the trial judge correctly noted, under Michigan law, driving while license suspended is a misdemeanor. Mich. Comp. Laws § 257.904(3). Thus, Petitioner's arrest, pursuant to a warrant the validity of which has not been

51

challenged, was not illegal.  As such, counsel's failure to challenge the validity of Petitioner's could not have been deficient.  Accordingly, the trial judge rejected this argument.  (ECF No. 13-35 at PageID.2029-30).

### 7.    Failure to Seek Enforcement of Petitioner's Immunity Agreement

Petitioner next argues that his trial attorney improperly failed to seek enforcement of "the full immunity" agreement that law enforcement provided to Petitioner.  (ECF No. 1-4 at PageID.255).  This argument fails for at least two reasons.

First, as the trial judge observed, this issue was explored in detail in the motion to suppress which Petitioner asserted prior to trial.  (ECF No. 13-11, Hearing Transcript, May 1, 2015; ECF No. 13-12, Hearing Transcript, May 12, 2015).  So, contrary to Petitioner's argument, his trial counsel did, in fact, pursue this issue.  Second, even had counsel failed to pursue this issue such would not have prejudiced Petitioner because, for the reasons discussed above, this issue is without merit.  The trial judge rejected this claim on the ground that Petitioner's "arguments are not supported by the record or any reasonable application of the law."  (ECF No. 13-35 at PageID.2030).

### 8.    Failing to Enforce Petitioner's Right to Counsel

Petitioner asserts that he is entitled to relief because his trial counsel "failed to enforce [his] right to an attorney as guaranteed by the Sixth Amendment."  (ECF No. 1-4 at PageID.255).  Specifically, Petitioner argues that his trial counsel failed to argue that Petitioner's statements to law enforcement should have been suppressed

because law enforcement disregarded his request for counsel.  This argument, however, fails for at least two reasons.

First, counsel raised this issue in the context of Petitioner's motion to suppress. (ECF No. 13-11, Hearing Transcript, May 1, 2015; ECF No. 13-12, Hearing Transcript, May 12, 2015).  So, contrary to Petitioner's argument, his trial counsel did, in fact, pursue this issue.  Second, even had counsel failed to pursue this issue such would not have prejudiced Petitioner because the trial judge concluded that Petitioner "was advised of his constitutional rights" and "did not make a demand for counsel."  (ECF No. 13-12, Hearing Transcript, May 12, 2015, at 174-76).

The trial judge denied Petitioner's claims of ineffective assistance of trial counsel in a detailed and well-reasoned opinion.  (ECF No. 13-34 at PageID.1997-2024).  On appeal, the Michigan Court of Appeals affirmed this determination declaring, "we fully agree [with the trial court] and adopt the [trial] court's ruling as our own." *Peterson*, 2017 WL 5759698 at *5.  This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

B.     Appellate Counsel

With respect to his appellate counsel, Petitioner argues that his attorney was ineffective for failing to assert on appeal the issues he later asserted pro se in his post-conviction motion for relief from judgment filed in the trial court.  The trial judge denied Petitioner's motion for relief from judgment, finding the issues Petitioner raised completely lacked merit.  (ECF No. 13-35 at PageID.2025-32).

To prevail on a claim that his appellate counsel rendered ineffective assistance, Petitioner must establish that there exists "a reasonable probability that inclusion of the issue would have changed the result of the appeal."  *Moss v. Miniard*, 62 F.4th 1002, 1014 (6th Cir. 2023) (citation omitted).  The trial court rejected the issues in question when Petitioner asserted them and Petitioner offers nothing to suggest that resolution of the claims in question would have been different had counsel asserted them instead.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

## **<u>CONCLUSION</u>**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Knauss' petition for writ of habeas corpus be denied.  The undersigned further recommends that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000); *Miller-El*, 537 U.S. at 336.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: January 31, 2024                    /s/ Phillip J. Green
                                          PHILLIP J. GREEN
                                          United States Magistrate Judge